IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED

FEB 2 4 2015

Clerk, U S District Court
District Of Montana
Billings

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

MACK EDWARD HARRIS,

    Defendant.

CR 13-98-BLG-SPW

OPINION and ORDER

On March 10, 2013, police officers forced their entry into an apartment located at 1301 Industrial Avenue, Billings, Montana. The police believed that the apartment was the scene of an ongoing domestic assault. Once inside, a protective sweep revealed the Defendant Mack Harris hiding beneath the kitchen sink. After placing Harris under arrest and taking him to a patrol car, officers located a handgun concealed underneath a bedroom dresser. That handgun formed the basis of Harris's subsequent Indictment. On January 23, 2015, Harris moved to suppress any evidence found within the apartment. Harris argues that the forced entry did not comport with the Fourth Amendment. Harris also contends that even if the police legally entered, they did not obtain valid consent to search the apartment.

On February 18, this Court held a hearing. At the hearing, the Court heard testimony from Officer Paul Lamantia,[1] Sergeant Patrick Curry, Officer Corey Kirkpatrick, Officer Jared Lausch, Officer David Raschkow, Officer Gearald McComb, and Leanna Devad. The Court has also reviewed recordings of body microphones attached to Officer Lamantia, Officer McComb, Officer Kirkpatrick, Officer Lausch, and Officer Raschkow.

The Court finds that law enforcement permissibly entered the apartment. The Court further finds that law enforcement obtained valid consent to search the apartment. For those reasons, the Court denies the Motion to Suppress.

## I. Background

Around 9:30 PM on March 10, 2013, Officer Lamantia was on routine patrol in a marked police vehicle when he received a dispatch to a disturbance at an apartment complex in Billings, MT. Dispatch relayed to Officer Lamantia that residents at the complex could hear a physical altercation between a male and a female inside an apartment. The residents reported hearing the occupants mention a gun. The residents also believed that they heard the sounds of strangulation coming from within the apartment.

Officer Lamantia arrived at the apartment complex and observed people gathering outside of the apartment building. On the second floor at 1301 Industrial

---

[1] All law enforcement officers referenced in this Order are employed by the Billings Police Department.

Avenue, Apartment #36's windows were open and onlookers could hear the apartment's occupants arguing. Officer Lamantia entered the apartment building and walked up the stairs to the apartment's door. Outside the door, Officer Lamantia heard what appeared to be an intense verbal altercation between a male and a female. Officer Lamantia knocked on the door and identified himself as police. Nobody answered the door.

Soon after, an onlooker told Officer Lamantia that a male was attempting to jump from the apartment's window. Officer Lamantia went to the bottom of the stairwell, exited the building, and attempted to place himself in a position to watch both the apartment's door and the window. Eventually, Sergeant Curry, Officer Raschkow, Officer Lausch, Officer Kirkpatrick, and Officer McComb arrived as backup.

While Officer Lamantia stood at the bottom of the stairwell, a woman, later identified as Devad, began speaking to Officer Lamantia through the apartment's open window. Officer Lamantia told Devad to open the apartment's door. Devad told Officer Lamantia that everything was alright and said she was not going to answer the door. Devad also said that she was alone. Officer Lamantia asked Devad several more times to open the door. Devad ended up closing the window and walking away.

Officer Lamantia knew that Devad was likely lying about being alone. Both the onlookers and Officer Lamantia heard distinct male and female voices arguing within the apartment. Also, once Officer Lamantia knocked on the door, onlookers reported that a male was attempting to jump out of the apartment's window. Based on his training and experience, Officer Lamantia knew that victims of domestic violence are frequently untruthful to law enforcement out of fear of their abuser.

An officer called the apartment's maintenance man to unlock the apartment's door. The maintenance man arrived shortly with a key, and Officer Lamantia attempted to unlock the door. The key made several revolutions within the lock, yet the door would not open. The maintenance man noticed that there was a secondary lock located above the primary lock. This secondary lock was placed in violation of the apartment complex's rules. Police called Devad's phone, but she did not answer.

Sergeant Curry decided to make a forced entry into the apartment. The officers lined up on the door while Officer McComb prepared to forcibly open the door with a sledge hammer. Devad asked the police to not forcibly open the apartment door and asked "Why are you doing that?" Officer McComb disregarded that request and knocked the door open.

The door opened up, but it quickly recoiled back closed. Officer Lamantia saw that a couch was placed in front of the door. The officers asked Devad to move the couch. With the officers pushing on the door and Devad pulling the couch, the door eventually opened wide enough to allow the officers into the apartment.

The officers entered the apartment with their firearms drawn. At least one officer had a shotgun. Upon entrance, an officer told Devad to "sit down in the corner and don't move." (Doc. 48, Gov't Ex. 2,[2] Officer Kirkpatrick's body microphone at 27:20). The officers immediately performed a primary sweep of the apartment and cleared the apartment's rooms and closets. The apartment was small, with only a living room, a kitchen area, a bedroom, and a bathroom. The officers did not locate a male on the primary sweep.

During the secondary sweep, Officer Lausch found Harris hiding in a cupboard under the kitchen sink. The officers removed Harris at gunpoint and made him lay down on the floor. An officer told Harris to cooperate and made him aware that there was "a 12 gauge at the back of [his] head." (Doc. 48, Gov't Ex. 5, Officer Lausch's body microphone at 07:15). Harris calmly told police that he had a knife in his pocket and that he did nothing wrong. The police told Harris that they would find his gun, with one officer claiming that they were "going to literally

---

[2] This Exhibit 2 refers to the DVD conventionally filed prior to the hearing. At the hearing, a photograph was admitted as government's Exhibit 2.

tear this place to pieces." (Officer Kirkpatrick's body mic at 30:10). Harris was handcuffed, read his *Miranda* rights, taken outside and placed into a patrol car for eventual transport to the Yellowstone County Detention Facility.

While the officers performed the protective sweeps, Sergeant Curry spoke to Devad. Devad was visibly shaken, and Sergeant Curry tried to calm her down. After the officers found Harris underneath the sink, Devad asked for an officer to bring her water bottle from the bedroom. Sergeant Curry retrieved Devad's water. In answering questions from Sergeant Curry, Devad spoke softly. Sergeant Curry believed that Devad was afraid of Harris hearing her answers.

What happened next is disputed by the parties. According to Sergeant Curry, he asked Devad for consent to search her apartment for a gun. Sergeant Curry claims that Devad initially shook her head affirmatively. Sergeant Curry asked Devad to respond out loud, and Devad quietly said "yes, yes." Based on Devad's consent, Sergeant Curry claims that he told the officers to begin searching the apartment. In contrast, Harris claims that Devad never consented to the search. At the hearing, Devad testified that when Sergeant Curry asked her for permission to search, she responded with "Why are you asking me? You're already doing it." Devad claims that she never nodded her head or said "yes." Devad testified that she never granted permission for law enforcement to search her apartment.

6

The Court finds Sergeant Curry more credible and finds that Devad consented to the search of her apartment. The Court acknowledges that there is no recording of Sergeant Curry asking Devad for consent. Sergeant Curry was not wearing a body microphone, and the other officers' body microphones did not pick up Sergeant Curry's questions. In addition, Sergeant Curry did not have Devad sign a written consent form, despite the form's availability and the Billings Police Department's policy of getting written consent whenever possible. Finally, none of the other officers heard Devad consent.

However, Sergeant Curry's testimony is corroborated by the evidence. About the time that Sergeant Curry claims to have asked Devad for consent, Devad is heard softly saying "yes, yes." (Doc. 48, Gov't Ex. 3, Officer Raschkow's body mic at 44:08). While Sergeant Curry's questions are inaudible, the body microphones portray a busy scene with multiple voices overlapping each other. It is difficult to make out what people are saying in the recordings. In addition, aside from Sergeant Curry, the officers were focused on securing Harris, so it is understandable that none of them recall hearing Devad consenting to the search.

The Court does not find Devad's testimony credible. There are multiple instances where Devad's testimony is contracted by the evidence. Devad claims that the incident started when she took too many prescription pills called "gabbies." Devad said she became irritated and the pills made it hard to breathe.

7

According to Devad, she became upset over pork chops that were being cooked for dinner. Devad claims that she threw a pork chop down, tore up the kitchen, and began yelling at Harris. Devad testified that Harris tried calming her down, and that she was the only one yelling. Devad denied anybody mentioning a firearm during their argument.

Devad's statements to the police portray a different scene. After the police removed Harris, an emotional Devad told Officer Lamantia that the incident started when Harris began baking a cake. (Doc. 45, Def.'s Ex. 1, Officer Lamantia's body mic at 8:50). Devad told Officer Lamantia that her prescription pills made her sleepy, and she did not help Harris with the cake. (*Id.*). Harris started yelling at Devad because of her refusal to help him. (*Id.*). The onlookers also contradict Devad's claim that she was the only aggressor. In the 911 call, the onlookers reported hearing Devad mention a gun under a mattress. (Doc. 48, Gov't Ex. 2 at 00:55). The 911 caller also reported hearing both a male and female arguing within the apartment. (*Id.*). Officer Lamantia also heard both a male and a female intensely arguing when he first arrived at the door. This all contradicts Devad's testimony that she was the only one yelling over a pork chop incident.

At the hearing, Devad denied telling Officer Lamantia that Harris told her not to open the door. Yet, Devad did tell Officer Lamantia that Harris told her not to answer the door and that he barricaded the door with the couch. (Officer

Lamantia's body mic at 5:20). Devad also testified that she did not tell Officer Lamantia that there was a history of domestic abuse between her and Harris. However, Devad did tell Officer Lamantia about at least one previous instance of abuse by Harris. (*Id.* at 1:20). A very emotional Devad cried while describing to Officer Lamantia that despite her previous cooperation, the police could not prevent Harris from inflicting further abuse. (*Id.*). Devad expressed apprehension at giving a recorded statement, because she feared that Harris would eventually hear it. (*Id.* at 3:10). Finally, when asked on cross-examination about the firearm that was eventually found in the apartment, Devad responded twice with "I don't know what you're talking about." The Court finds it incredible that Devad does not know anything about the gun. It was located within her apartment, and she was present when the gun was found. Further, Devad likely knows why Harris is facing federal charges.

In sum, the Court believes that Devad lied at the hearing in an attempt to protect Harris. The Court does not find her version of the incident credible. The Court finds that Devad granted Sergeant Curry permission to search the apartment.

The officers began searching after Devad consented. After several minutes, Officer Kirkpatrick found a handgun wrapped in a white shirt concealed beneath a dresser in the bedroom.

The officers later discovered that Harris worked in North Dakota for weeks at a time and came to Billings to stay with Devad on his time off. Both Harris and Devad confirmed that they were engaged to be married. The government later learned that on July 31, 2012, about nine months prior to the incident, Harris pled guilty to Negligent Endangerment in the Yellowstone County Justice Court. He received a 12 month suspended sentence. As a condition of his suspended sentence, the Justice Court ordered that Harris "shall have no unreasonable contact with Leanna Devad." (Doc. 47-2 at 3).

Harris was indicted on charges of Felon in Possession of a Firearm and Possession of a Firearm by a Person Convicted of a Misdemeanor Crime of Domestic Violence. (Doc. 1). Harris now moves to suppress the firearm found in Devad's apartment. He argues that no exceptions justified the warrantless entry and search of the apartment. Harris contends that even if Devad consented to the search, the consent was not granted voluntarily. The government argues that exigent circumstances and the emergency doctrine justified the entry into the apartment. The government also argues that Harris does not have "standing" to challenge Devad's consent. Alternatively, the government contends that Devad voluntarily granted Sergeant Curry consent to search the apartment. The Court will address each argument in turn.

## II. The entry into the apartment

The Fourth Amendment prohibits "unreasonable searches and seizures." Warrantless searches of a home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). However, because the touchstone of the Fourth Amendment is "reasonableness," there are several warrant exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). One such exception is when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (internal quotations omitted).

To justify a warrantless search under the exigency exception, two requirements must be met: "first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001). Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a reasonable person to believe that the suspect has committed an offense. *United States v. Smith*, 802 F. 2d 1119, 1123 (9th Cir. 2005). Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other

11

consequence improperly frustrating legitimate law enforcement efforts." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005).

In a factually similar case, the Ninth Circuit found that exigent circumstances justified the warrantless entry into a hotel room when the officer responded to a report of domestic abuse. *United States v. Brooks*, 367 F.3d 1128 (9th Cir. 2004). In *Brooks*, a hotel guest called the police after hearing what she believed were the sounds of a woman being beaten in the neighboring room. *Id.* at 1130. An officer arrived and knocked on the hotel room door, and a man answered. *Id.* The officer explained that he received an emergency call regarding a domestic disturbance. *Id.* The man said, "I knew you were coming. She was very loud." *Id.* With the door open, the officer noticed that the room was in "total disarray." *Id.* The officer asked to speak to the woman, and the man said she was in the bathroom. *Id.* When the man turned and asked the woman if she wanted to talk to the police, the officer let himself into the room and closed the door. *Id.* The officer never received permission to enter the room. *Id.* Once inside, the officer eventually discovered evidence of a recent bank robbery. *Id.*

While the officer entered without a warrant, the Ninth Circuit concluded that exigency justified the entry. *Id.* at 1136-37. As noted above, the Ninth Circuit needed to find that both probable cause and exigent circumstances existed. *Id.* at 1133. As to probable cause, the Ninth Circuit found that the neighboring guest's

12

phone call, the man's statement about the woman being very loud, and the observation that the room was in disarray gave the officer probable cause for his entry. *Id.* at 1134.

As to the exigent circumstances, the Court found that the officer's objectively reasonable belief that a woman might be injured provided sufficient exigency. *Id.* at 1135. The same facts supporting probable cause also supported the finding of exigent circumstances. *Id.* The Court rejected the argument that the officer should have first spoken to the woman before entering by stating:

> Considering the tendency of victims of domestic abuse to be less than forthcoming about the harms to which they were or will likely be exposed at the hands of an aggressor who remains on the scene, [the officer] was entitled to search inside the hotel room, which in the total circumstances was an objectively reasonable way to address the exigency.

*Id.* at 1136. The finding of exigent circumstances was "anchored by [the officer's] legitimate concern for the safety of a woman reported to be in danger of domestic abuse." *Id.*

Here, the Court finds that exigent circumstances justified the officers' forced entry into Devad's apartment. Similar to *Brooks*, the police were alerted to a domestic physical altercation by a neighbor. This report was corroborated when Officer Lamantia heard a male and a female engaging in an intense argument within the apartment. When Devad spoke to Officer Lamantia, she denied the presence of any male. Officer Lamantia knew this was false. Based on his training

13

and experience, Officer Lamantia knew that domestic abuse victims frequently falsify information to police out of fear of retaliation from their attacker. Devad then declined to open the door for the police. Based on these facts, the police reasonably believed that there was a "fair probability or substantial chance" that an assault had occurred. *Id.* at 1134.

The same facts also support the finding of exigent circumstances. The officers reasonably believed that entry into the apartment was necessary to prevent physical harm to Devad. In addition to the intense arguments, the onlookers reported hearing strangulation sounds and a discussion about a gun located within the apartment. Given the totality of the circumstances, sufficient exigency justified the entry into the apartment.

The warrantless entry is not unreasonable just because Devad told the police not to enter her apartment and said everything was fine. As *Brooks* observed, domestic assault victims are frequently untruthful, especially when the offender remains on the scene. *Id.* at 1136; *see also Fletcher v. Town of Clinton*, 196 F.3d 41, 52 (1st Cir. 1999) ("In domestic violence situations, officers may reasonably consider whether the victim is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes"); and *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 338 (7th Cir. 2010) ("Many victims of domestic violence fear that the danger they face will increase if they assist police or

14

prosecutors"). As the officers had probable cause that Devad was a victim of a domestic assault and that the offender remained within the apartment, exigent circumstances justified the warrantless entry into the apartment.

### III. Harris's "standing" to challenge Devad's consent

Before addressing the merits of Harris's arguments regarding consent, the government argues that Harris does not have standing to challenge Devad's consent. The government cites to Article III, § 2 of the Constitution to discuss when a party has standing to assert a claim in federal court. The Court is not persuaded.

The Supreme Court did away with the concept of "standing" when a criminal defendant moves to suppress evidence in *Rakas v. Illinois*, 439 U.S. 128 (1978). In *Rakas*, the Court rejected a standing analysis and held that the proper inquiry is whether the defendant had "his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Id.* at 133. The analysis of suppression issues is "more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 140. Accordingly, the proper inquiry is "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.*

Harris had a reasonable expectation of privacy in the apartment. An overnight guest at a house has an expectation of privacy in that house. *Minnesota*

*v. Olson*, 495 U.S. 91 (1990). Similarly, a visitor to an apartment who may have occasionally stayed overnight has an expectation of privacy in the apartment. *Jones v. United States*, 362 U.S. 257 (1960). However, there is no reasonable expectation of privacy for somebody who enters an apartment for only a short period of time to conduct a commercial transaction. *Minnesota v. Carter*, 525 U.S. 83 (1998).

Harris stayed occasionally at Devad's apartment. While he worked and mainly lived in North Dakota, Harris occasionally traveled back to Billings to stay with Devad, his significant other. This is sufficient to give him an expectation of privacy under *Olson* and *Jones*.

The government points to a recent Third Circuit case that held that a person does not have a reasonable expectation of privacy in a home if a restraining order makes his presence unlawful. *U.S. v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014). In *Cortez-Dutrieville*, police searched a woman's ("Newell") house after a package of heroin was delivered to the residence. *Id.* at 883. In the house, the police arrested defendant Dutrieville, who was previously in a relationship with Newell. *Id.* Police found heroin in the master bedroom and found incriminating evidence in the Dutrieville's luggage. *Id.* The police later discovered that the defendant was the subject of a Protection From Abuse Order, which provided that:

(1) Dutrieville was not to contact Newell except to make child custody arrangements; (2) Dutrieville was "completely evicted and

excluded from" Newell's residence; (3) Dutrieville had "no right or privilege to enter or be present on the premises of [Newell]"; (4) the protection order would remain in effect until October 7, 2013; (5) Newell's consent could not override the express terms of the order; and (6) Dutrieville could be arrested without a warrant for violating the terms of the order.

*Id.* at 883. Dutrieville was indicted for possessing heroin, and he moved to suppress the evidence found in the police's search of Newell's house. *Id.* The District Court ruled that Dutrieville did not have an expectation of privacy in Newell's house because the restraining order barred him from the home. *Id.*

The Third Circuit affirmed. The Third Circuit recognized that an overnight guest generally has a reasonable expectation of privacy in a home. *Id.* at 884. However, Dutrieville did not have a reasonable expectation of privacy while he was in Newell's home because of the restraining order. *Id.* Important to the Third Circuit was that Newell's consent could not override the terms of the protection order. *Id.* Consequently, "like a trespasser, a squatter, or any individual who occupies a piece of property unlawfully, Dutrieville's presence in the home was wrongful, and therefore any expectation of privacy he may have had was not one that society is prepared to recognize as reasonable." *Id.* at 884-85 (citations and quotations omitted).

*Cortez-Dutrieville* is distinguishable because Harris was not entirely forbidden from being in Devad's apartment. In *Cortez-Dutrieville*, the Third Circuit noted that pursuant to the applicable state law, Dutrievelle's mere presence

in Newell's house was illegal. *Id.* at 884. In contrast, Harris's probation condition only specified that he could not have "unreasonable contact" with Devad. Harris's presence by itself in Devad's apartment was not illegal. Since Harris could have permissibly been in Devad's apartment, he maintained an expectation of privacy. Whether he subsequently engaged in illegal conduct as alleged by the government does not impact that expectation of privacy.

Further, a third party can challenge another person's consent as voluntarily given. For example, in *Bumper v. N. Carolina*, 391 U.S. 1788 (1968), a grandmother consented to a search of her house. The police subsequently found evidence that implicated her grandson in a prior crime. The Supreme Court found that the grandmother's consent was involuntarily given, and the evidence was suppressed from introduction against her grandson. *Id.* at 550. The Ninth Circuit has similarly analyzed whether a third party's consent to search was voluntarily given. *See United States v. Reid*, 226 F.3d 1020 (9th Cir. 2000); *United States v. Patayan Soriano*, 361 F.3d 494, 497 (9th Cir. 2004); *United States v. Furrow*, 229 F.3d 805, 809 (9th Cir. 2000) overruled on other grounds by *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001); and *United States v. Brown*, 563 F.3d 410, 413 (9th Cir. 2009). Since Harris had an expectation of privacy in Devad's apartment, he can challenge whether the search comported with the Fourth Amendment.

## IV. Devad's consent to search the apartment

Harris first argues that Devad never consented to the search of her apartment. As discussed above, the Court finds that Devad did consent to the search. Harris alternatively argues that even if Devad gave permission to the police to search her apartment, the consent was not voluntarily given.

Voluntarily-given consent is a recognized exception to the Fourth Amendment's protection against unreasonable searches. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Five factors are used to determine whether consent was voluntary:

> (1) Whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). No factor is dispositive, and the totality of the circumstances must be considered. *United States v. Washington*, 490 F.3d 765, 775-76 (9th Cir. 2007). The government bears the burden of showing that the defendant freely and voluntarily consented. *Russell*, 664 F.3d at 1281.

A review of the factors favor a finding that consent was voluntarily given. The first factor favors the government, as Devad was not in custody. The second factor also favors the government. While the officers had their guns drawn, they

were not directed at Devad. Instead, the officers had weapons pointed at Harris until he was ushered to the police car. An officer may have briefly pointed a weapon at Devad immediately after gaining entry into the apartment; however, it would have been incidental and not an attempt to coerce Devad into consenting to a search.

The third factor is inapplicable. *Washington*, 490 F.3d at 776. Since Devad was not the subject of a custodial interrogation, *Miranda* rights were not required. When *Miranda* rights are not required, their absence does not favor either party. *Russell*, 664 F.3d at 1281. The fourth factor favors Harris, as nobody informed Devad that she could refuse to consent to the search. However, an "officer is not *required* to inform the person being searched that he has a right to refuse consent; doing so simply weighs in favor of finding consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 n. 6 (9th Cir. 2010) (emphasis in original). The fifth factor favors the government, as Sergeant Curry did not tell Devad he could simply obtain a search warrant if she refused consent. *Russell*, 664 F.3d at 1282.

Finally, the totality of the circumstances shows that Devad voluntarily consented to the search. Once inside the apartment, the officers did not treat Devad like a suspect. Instead, Sergeant Curry treated Devad like a victim and retrieved a water bottle for her. Devad did not have reason to believe that Sergeant

Curry was coercing her into consenting. Instead, the officers acted in Devad's best interests by searching her apartment.

Based on the above discussion, the Court finds that Devad voluntarily consented to the search of her apartment. The police did not apply coercion or otherwise render Devad's consent involuntary.

## V. Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Harris's Motion to Suppress (Doc. 43) is DENIED.

DATED this 24 day of February, 2014.

SUSAN P. WATTERS
United States District Judge